842 So.2d 245 (2003)
Glenn STORM, Appellant, Cross-appellee,
v.
ALLIED UNIVERSAL CORPORATION, a Florida corporation and RObert Namoff, Appellees/Cross-appellants.
Nos. 3D01-3563, 3D01-2152.
District Court of Appeal of Florida, Third District.
April 9, 2003.
*246 Bernard Butts, Jr., Hialeah; Donna Ballman (Davie), Ft. Lauderdale; Kutner, Rubinoff, Bush & Lerner and Susan Lerner, Miami, for Storm.
Anania, Bandklayder, Blackwell, Baumgarten & Torricella and Douglas H. Stein, and Daniel K. Bandklayder, Miami, for Allied and Namoff.
Before SCHWARTZ, C.J., and SHEVIN and WELLS, JJ.
SCHWARTZ, Chief Judge.
In an order granting a new trial, on appeal in case no. 01-2152,[1] the trial judge concludedon ample, indeed overwhelming, evidence adduced in extensive post-trial proceedingsthat the plaintiff, Storm, who had won a large jury verdict in his favor, had "misled and deceived the Defendants, the jury and this Court about matters which strike at the heart of Storm's claims." We reject out of hand Storm's various attacks upon this ruling and its consequences, including, in the judgment on appeal in case no. 01-3563, the assessment of attorney's fees against him for the efforts required of the defendants to reveal his multiple acts of fraud, perjury, and deception. See Babe Elias Builders, Inc. v. Pernick, 765 So.2d 119 (Fla. 3d DCA 2000); Nordyne, Inc. v. Florida Mobile Home Supply, Inc., 625 So.2d 1283 (Fla. 1st DCA 1993), review dismissed, 630 So.2d 1100 (Fla.1993).
We can find no cognizable reason, however, for the trial court's exercise of "discretion,"[2] challenged on the cross-appeal, to grant a new trial, rather than a dismissal with prejudice because of the plaintiff's misconduct. On this record, the ends of justice preclude a miscreant like Storm from continuing, in a new trial or otherwise, his use of the very system he has corrupted. See Cabrerizo v. Fortune, Int'l *247 Realty, 760 So.2d 228 (Fla. 3d DCA 2000); Hanono v. Murphy, 723 So.2d 892 (Fla. 3d DCA 1998); Mendez v. Blanco, 665 So.2d 1149 (Fla. 3d DCA 1996). Accordingly, we order that after remand, Storm's action be dismissed with prejudice.
Affirmed in part, reversed in part, remanded with directions.
 APPENDIX A
 IN THE CIRCUIT COURT OF
 THE 11th JUDICIAL CIRCUIT,
 IN AND FOR DADE COUNTY,
 FLORIDA
 GENERAL JURISDICTION DIVISION
 CASE NO: 95-20273 CA 25
GLENN STORM,
 Plaintiff,
vs.
ALLIED UNIVERSAL CORP.,
a Florida corporation and
ROBERT NAMOFF,
 Defendants.

ORDER SETTING ASIDE VERDICT, VACATING FINAL JUDGMENTS AND GRANTING A NEW TRIAL
THIS MATTER came before the Court, on May 22, 2001, upon the Motion to Set Aside Verdict and Final Judgment and to Dismiss or for New Trial Based on Plaintiff's Misleading and Perjured Testimony and Abuse of Discovery ("Motion to Set Aside") filed herein by the Defendants, ALLIED UNIVERSAL CORPORATION ("ALLIED") and ROBERT NAMOFF ("NAMOFF")(collectively "Defendants"). The Court having reviewed the Motion, the Defendants' Memorandum of Law (and attached Exhibits) filed May 21, 2001 ("Defendants' Memorandum"), the accompanying record evidence, the applicable authorities and the Plaintiff's Memorandum of Law in Opposition to Defendants' Post Trial Motions, having heard the argument of counsel, and being otherwise fully advised in the premises, hereby makes the following findings of fact and conclusions of law:

BACKGROUND
The Plaintiff, GLENN STORM ("STORM"), was employed by ALLIED.[1] STORM alleges that ALLIED wrongfully discharged him on August 24, 1995 in retaliation for his prosecuting a worker's compensation claim. The Defendants deny these allegations.
The case came on for trial March 13, 2000. At the conclusion of the four day trial, the jury returned a verdict in favor of STORM and awarded the following damages: $138,800 for "lost income"; $23,782.33 for "401K entitlement"; $4,182.69 for "vacation pay"; and $750,000 for STORM's "mental anguish, emotional distress and humiliation."
The Defendants filed numerous post-trial motions, including the instant Motion to Set Aside. In their Motion, the Defendants assert that STORM: (a) testified falsely at his depositions and at trial; and (b) misled and/or deceived the jury. The Defendants, in turn, request that this Court set aside the verdict, vacate the final judgments, and dismiss this case with prejudice or, alternatively, order a new trial and impose sanctions against STORM.
For the reasons set forth below, the Court hereby grants the Defendants' Motion, sets aside the jury's verdict, vacates the March 17, 2000 final judgments against the Defendants, and orders a new trial.

FINDINGS OF FACT
At STORM's pre-trial depositions and at trial, STORM, a chemical engineer with a Master's degree, unequivocally testified that, for at least two years after ALLIED discharged him, he devoted his "full-time efforts" (without success) to obtaining full-time, gainful employment at a chemical company:

*248 My full-time efforts for that two year period was to gain employment at a chemical company and to be employed (Trial, p. 788, lines 14-16).
Question (April, 10, 1996, Deposition, p. 71): What is your current employment status?
Answer: I'm looking for full-time work.
At trial, STORM testified that, during these two years, he "lost (his) total income and made absolutely nothing" (Trial, p. 755, lines 4-7). STORM further testified that the only reason that he was "not working during those two years" was that nobody would offer him a job (Trial, p. 327). STORM also testified that he "realized that (he) had been black balled" (Trial, p. 261) and that prospective employers refused to consider him, presumably because of adverse references from his former employer, ALLIED (Trial, p. 260-261, 326).[2]
Post-trial discovery indisputably has established that, contrary to STORM's trial testimony, he did not devote his "full time efforts" for at least two years following his August 24, 1995 discharge to an unsuccessful search for gainful employment. Instead, during this time frame, STORM was actively engaged in business through two chemical supply companies that he formed in 1995, Premier Industries International, Inc. ("Premier") and Coastal Manufacturing, Inc. ("Coastal").
At trial, STORM testified that Premier "never did become a functioning company." (Trial, p. 262). At STORM's August 2, 1999 deposition, p. 92, STORM testified:
Question: Is there anything that Premier has ever done?
Answer: No.
When STORM was questioned at trial as to whether he was even engaged in any "start up activity" with Premier during this two year time frame, he testified that "there was no focus or start up activity on my behalf. My full-time efforts for that two year period [were] to gain employment at a chemical company and to be employed" (Trial, p. 788).
The above testimony is false. In actuality, during this time frame, STORM, through Premier, was engaged in the business of selling chemical products. In fact, during post-trial discovery, Defendants uncovered numerous invoices, purchase orders, checks and deposit slips which confirm that, from September, 1995 through June, 1997, Premier received approximately $48,000 from the sale of chemical products to various customers, primarily Greenwich Air Services, Inc. and Commercial Chemical Products, Inc. (Defendants' Memorandum, Exhibits "C" and "D").[3]
With regard to Coastal, STORM testified at trial that during the subject two year time frame, he had "no involvement" with Coastal (Trial, p. 789) and that STORM's partner, Simon Fernandez ("Fernandez") ran Coastal from the very beginning ... he man-handled and managed Coastal from day one" (Trial, p. 789). This testimony is false. Fernandez testified at his post-trial deposition that, in actuality, STORM, rather than Fernandez, ran all of Coastal's day-to-day business *249 operations during this time frame. Fernandez further testified that STORM "handled most of the routine day-to-day affairs and administrative matters of the company from the beginning of the company (January, 1996) onward (Fernandez Deposition, pp. 28 43). Specifically, STORM: (a) prepared the company's tax returns (Fernandez Deposition, p. 19); (b) handled 100% of Coastal's bookkeeping and accounting (Fernandez Deposition, pp. 22-24); (c) dealt with Coastal's vendors and suppliers (Fernandez Deposition, p. 25); (d) paid Coastal's bills, obtained permits for the handling of hazardous materials and certified the company as minority firm/minority contractor (Fernandez Deposition, p. 26); (e) handled Coastal's shipping and made its bank deposits (Fernandez Deposition, p. 31); (f) obtained, in January, 1996, Coastal's UPC membership and instituted a bar coding system for Coastal's products (Fernandez Deposition, p. 35); and (g) obtained Coastal's chemicals and supplies (Fernandez Deposition, pp. 42-45). In Short, STORM "handled everything, like I said before ... from the beginning" (Fernandez Deposition, p. 44).[4]
The foregoing record evidence convincingly demonstrates that STORM's trial testimony regarding his activities during the two years following his discharge, i.e. his purported full time, unsuccessful job search, inability to find work, total loss of income and resulting mental distress, was false and, at the very least, misled and deceived the jury.[5] This testimony undermined the integrity of the entire trial.
STORM also misled and deceived the jury with evidence and argument that ALLIED refused to "give him back the money that he had contributed to his 401K pension" (Trial, p. 215). STORM testified at trial that ALLIED "still owed" him his 401K money (Trial, p. 259) and "not only did I not get my 401K, I could not get a quarterly or annual report" (Trial, p. 810). Moreover, STORM testified at trial that "if anybody was a thief here it was them" (Trial, p. 259). In her opening statement, STORM's counsel emphasized that ALLIED "did not even ... give him back the money that he had contributed to his 401K pension" (Trial, p. 215).
Contrary to STORM's trial testimony, his 401K contributions indisputably remain *250 in his account at Mass Mutual, ALLIED's 401K plan administrator. Moreover, STORM has always had, and continues to have, complete access to those funds. As of May 15, 2001, the balance in STORM's 401K account at Mass Mutual is $25,595.89 (Defendants' Memorandum, Exhibit "E"). ALLIED has no control over these funds. STORM, on the other hand, has the ability to request loans, withdrawals, transfers, investment options and other account changes or transactions simply by calling Mass Mutual at its 800 number. STORM's contention that ALLIED somehow blocked his access to his 401K account by refusing to provide him with account information is incredible. During STORM's tenure as an active employee: (a) his weekly paychecks contained stubs that set forth his weekly and year-to-date 401K contributions and (b) approximately four weeks after the end of each quarter, he received, with his paycheck, a quarterly account summary prepared by the plan administrator. Since STORM worked at ALLIED until August, 1995, he received quarterly statements, with his paychecks, in April and July, 1995. See Defendants' Memorandum, Exhibit "E". STORM's testimony-and his counsel's argumentthat ALLIED refused to "give him back" his 401K funds severely prejudiced the Defendants. Moreover, the prejudice goes far beyond the jury's separate award of $23,782.33 for "401K entitlement." This testimony and argument discredited ALLIED and NAMOFF in the eyes of the jury, damaged the credibility of the defense witnesses on all issues, and undermined the integrity of the entire trial and the jury's verdict.
STORM further misled and deceived the jury, and deliberately appealed to the jury's emotions, passions and sympathy, by claiming that STORM's mental anguish and emotional distress resulting from his termination was particularly sever because, at the time ALLIED discharged STORM, "his father had just died" (Trial, p. 273, 845) and, as a result "this was two of the worst years of (his) life" (Trial, p. 273). In closing argument, Plaintiff's counsel emphatically reiterated this point when she urged the jury to award STORM hundreds of thousands of dollars for his mental anguish, emotional distress and humiliation:
Ms. Ballman (Trial, p. 845): These are the three numbers that we are asking you to fill in on that verdict form. Now, the next thing you are going to be asked is emotional distress damages: What is the total amount of damages, if any, sustained by Glenn Storm for mental anguish, emotional distress and humiliation caused by his discharge.
You heard Mr. Storm's emotional testimony about the extent of the humiliation, having to borrow money from his mother, how his father had just died on top of that. You heard it. You remember how visibly shaken he was. STORM's counsel's argument related to the following emotional trial testimony:
Question (by Ms. Ballman, Trial, p. 273): Now, describe to me your feelings over the two years when you were looking for a job.
Answer: Ms. Ballman, this was two of the worst years of my life. Like I told you, I am an only child. My dad passed away.
Question (by Ms. Ballman, Trial, p. 273-274): You mentioned a couple of times that your father just passed away. You must have suffered some sort of emotional upset from that. Can you describe to me how the acts that we discussed here by ALLIED caused you any distress that was different from the distress *251 you have suffered regarding the death of your father?
Answer (Trial, p. 274): I mean, your father is your father and you see him go. To see him go
Post-trial, Defendants discovered that, in actuality, STORM's father died in August, 1992, more than three years before ALLIED discharged STORM.[6] At the May 22, 2001 hearing on Defendant's post-trial motions, Plaintiff's counsel, Donna Ballman, Esq., stated that, at the time of the trial, she did not know this. Nevertheless, there can be no doubt that STORM did. His emotional testimony, and his counsel's emphatic reiteration of this emotional testimony in her closing argument, misled and deceived the jury. STORM deliberately (and successfully) appealed directly to the jury's emotions, passions and sympathy, in order to bolster STORM's claim for mental anguish and emotional distress damages. His success in so misleading the jury is reflected by the jury's award of $750,000 for STORM's alleged mental anguish and emotional distress.

CONCLUSIONS OF LAW
As the Fourth District Court of Appeal recently observed:
The late George Allen, Sr., while serving as coach of the Washington Redskins football team, once said that the only thing worse than dying was losing. Perhaps that is an appropriate attitude for professional sports. It is not equally appropriate for all areas of human endeavor. Today, regretfully, some seem to view winning a case as more important than supporting the system that all of us look to for justice ...
Berman & Feldman v. Winn Dixie, Inc., 684 So.2d 320, 321 (Fla. 4th DCA 1996).
This court finds, based on clear and convincing evidence, that STORM's deposition and trial testimony were replete with falsehoods, misrepresentations and outright lies that strike at the heart of STORM's wrongful discharge claim. STORM's false and misleading testimony directly relates to: (a) STORM's claimed inability to find a job for two years despite his "full time efforts" to do so; (b) STORM's claim that, as a result of the Defendants' alleged wrongful acts, he earned "absolutely nothing" for at least two years following his discharge; (c) ALLIED's alleged refusal to "give him back the money that he had contributed to his 401K pension"; and (d) STORM's alleged mental anguish and emotional distress. Our own Third District Court of Appeal recently observed:
The suggestion that perjury in a civil case is acceptable, or in the alternative, that it will go unpunished even when discovered, has gained regrettable acceptance among many. I can think of few crimes, however, that strike more viciously against the integrity of our system of justice than the crime of perjury. In my judgment, it is imperative that when such conduct is identified, offenders be immediately investigated and, if the evidence warrants, prosecuted to the full extent permitted by law.
Metropolitan Dade County v. Martinsen, 736 So.2d 794, 796 (Fla. 3d DCA 1999)(Sorondo, J., concurring). A party who has been guilty of fraud or misconduct in the prosecution or defense of a civil proceeding should not be permitted to continue to employ the very institution (the party) has subverted to achieve his or her ends. Rosenthal v. Rodriguez, 750 So.2d 703 (Fla. 3d DCA 2000).
*252 This Court has "the inherent power to regulate litigation and to sanction litigants for abusive practices." Vargas v. Peltz, 901 F.Supp. 1572, 1579 (S.D.Fla.1995). Florida courts consistently have relied on their inherent authority to sanction litigants for abusive practices as a basis for dismissing or striking the claims of litigants who repeatedly lie under oath. See, e.g., Rosenthal, supra (holding that the trial court properly exercised its discretion by striking plaintiff's pleadings and dismissing her case with prejudice, based on plaintiff's repeated and pervasive perjurious statements on matters central to her personal injury action); Hanono v. Murphy, 723 So.2d 892 (Fla. 3d DCA 1998)(holding that a dismissal with prejudice of plaintiff's personal injury claim is required, where the plaintiff was adjudicated guilty of perjury based on his false deposition testimony regarding the nature and extent of his injuries and impairment); Savino v. Florida Drive In Theatre Mgt., Inc., 697 So.2d 1011 (Fla. 4th DCA 1997)(trial court properly dismissed personal injury claim of plaintiff, with prejudice, where plaintiff lied under oath and to his treating physicians about his educational background, his ability to work and his level of intelligence). See also O'Vahey v. Miller, 644 So.2d 550 (Fla. 3d DCA 1994); Cox v. Burke, 706 So.2d 43 (Fla. 5th DCA 1998). Where it is shown that the prevailing party knowingly gave or used false testimony, the trial court in its discretion may, at the very least, grant a new trial. Gaiter v. Winn Dixie Stores, Inc., 376 So.2d 912 (Fla. 3d DCA 1979). In the as-yet unpublished opinion in Kenet, M.D. v. Bailey Hunt Jones & Busto, 785 So.2d 515, 25 Fla. L. Weekly, D1605 (Fla. 3d DCA 2000), the Court held that the offending party's testimony need not be perjurious to warrant the granting of a new trial. To the contrary, it is sufficient that the party's testimony is inaccurate and misleading.
The Supreme Court of Florida has summarized the trial court's discretion in ruling on a motion for new trial as follows:
To summarize, this court has repeatedly held that the trial judge has broad discretion in ruling on a motion for new trial on the grounds that the verdict is contrary to the manifest weight of the evidence. A trial judge has the responsibility to draw "on his (or her) talents, his (or her) knowledge and his (or her) experience to keep the search for the truth in a proper channel, and the trial judge should always grant a motion for a new trial when the jury has been deceived as to the force and the credibility of the evidence or has been influenced by considerations outside the record. The trial judge's discretion permits the grant of a new trial although it is not `clear, obvious and indisputable that the jury was wronged.'"
Brown v. Estate of Stuckey, 749 So.2d 490, 497 (Fla., 1999)(reh'g denied, January 12, 2000).
Here the record evidence clearly and convincingly demonstrates that, throughout this litigation, STORM has misled and deceived the Defendants, the jury and this Court about matters which strike at the heart of STORM's claims, i.e., his alleged: (a) inability to obtain employment; (b) lost earnings; (c) mental anguish and emotional distress, during what he described at trial as "the worst two years of my life"; and (d) the Defendants' purported refusal to "give him back the money that he had contributed to his 401K pension." STORM's indisputably false and misleading testimony on these issues permeated the trial, severely damaged the credibility of the defense witnesses on all issues and undermined the integrity of the entire trial. "A system that depends on an adversary's *253 ability to uncover falsehoods is doomed to failure, which is why this kind of conduct must be discouraged in the strongest possible way." Cox, at 47. This Court simply cannot condone Plaintiff's lack of candor, which made it impossible for the jury and this Court to render a just result. This Court finds that, at the very least, the jury has been deceived as to the force and credibility of the evidence and the jury's verdict is against the manifest weight of the evidence. This court is convinced that based on STORM's misconduct in his prosecution of this case, it would be appropriate for this Court to dismiss this case with prejudice. Instead, however, this Court chooses, in the exercise of its discretion, to set aside the verdict, vacate the final judgments entered in STORM's favor and against the Defendants, and order a new trial.
Accordingly, it is
CONSIDERED, ORDERED and ADJUDGED as follows:
1. Defendants' Motion to Set Aside Verdict and Final Judgment and to Dismiss or for New Trial Based on Plaintiff's Misleading and Perjured Testimony and Abuse of Discovery be, and the same is hereby GRANTED.
2. The jury's verdict and the final judgments dated March 17, 2000 against the Defendants, ALLIED UNIVERSAL CORPORATION and ROBERT NAMOFF, be and the same are vacated in all respects.
3. This Court hereby orders a new trial.
DONE AND ORDERED in Chambers, at Miami, Dade County, Florida, this 3rd day of July, 2001.
 /s/ Philip Bloom
 THE HONORABLE PHILIP
 BLOOM
 CIRCUIT COURT JUDGE
Copies to:
 Daniel K. Bandklayder, Esq.
 Donald W. Hardeman, Jr., Esq.
 Bernard H. Butts, Jr., Esq.
 Donna Marie Ballman, Esq.
 Susan S. Lerner, Esq.
NOTES
[1] See Appendix A.
[2] The only apparent reason for this aspect of the trial judge's ruling was his statement that he was "going to give the Plaintiff the break of his life." This is precisely the kind of legal arbitrariness which cannot support a discretionary ruling. See Canakaris v. Canakaris, 382 So.2d 1197, 1203 (Fla.1980)("The trial court's discretionary power is subject only to the test of reasonableness, but that test requires a determination of whether there is logic and justification for the result. The trial court's discretionary power was never intended to be exercised in accordance with whim or caprice of the judge nor in an inconsistent manner."); DeVaughn v. DeVaughn, 840 So.2d 1128 (Fla. 5th DCA 2003); Arango v. Arango, 450 So.2d 583 (Fla. 3d DCA 1984).
[1] NAMOFF is Allied's Chief Executive Officer.
[2] STORM could not identify a single witness to support his contention that his purported inability to find a job was caused by adverse references from Allied.
[3] At trial, STORM tried to explain away the nearly $50,000 in deposits reflected on Premier's checking account statements by attributing them to (a) loans from his mother; (b) "sloppy bookkeeping" on his part, in that he mistakenly deposited his personal funds into corporate accounts; and (c) proceeds that he received from the sale of his deceased father's electric train sets, furnishings and collectibles (Trial, p. 784, 787). This testimony also is false. The checks and deposits slips obtained through post-trial discovery reflect that, contrary to STORM's trial testimony, nearly all of the deposits into Premier's account are from Commercial Chemical Products, Inc., Greenwich Air Services, Inc., TNT Doogan, The Dupont Company, Coastal Manufacturing and Goggin Truck Line, Inc.
[4] STORM misled the Defendants, the jury and this Court, and attempted to "cover up" Coastal's business operations and his extensive involvement in its day-to-day operations by referring to it as a "start up" company that "never got off the ground" and "generated no income." The misleading nature of this testimony is evident from Coastal's bank statements, which reflect deposits of approximately $75,000 during this time frame, from entities which include: Wholesale Emporium of Florida, Auto Wash Supply, Inc., Biscayne Park, the Pointe Bayside, Cason Enterprises, Inc., SAK Unlimited, Commercial Chemical Products, Inc., Deep South Trading Company, Monarch Supply Corp., Northern Leasing Systems, Print Max, Inc. and American Express Travel. Again, the records obtained post-trial establish the falsity of STORM's trial testimony that these deposits came from his mother, the sale of his deceased father's assets and/or "sloppy bookkeeping."
[5] STORM's trial testimony that his inability to find work during this two year time frame was attributable solely to the fact that no one would hire him (presumably because ALLIED "black balled" him) is further belied by the indisputable fact that STORM filed a claim for worker's compensation wage loss benefits, in which he certified that, for at least a portion of this time frame, he was unable to work because of injuries he allegedly sustained at ALLIED. Specifically, in STORM's Petition for Benefits, he states that he "can't work because of debilitating headaches, severe neck and left shoulder/arm pain, loose, painful and misaligned teeth, TMJ, loss of memory, depression, insomnia ... temporary total disability from December 6, 1995." (Defendants' Memorandum, Exhibit "A").
[6] See Defendants' Memorandum, Exhibit "F".