840 So.2d 1128 (2003)
Cheryl Ann DeVAUGHN, etc. Appellant,
v.
Michael DeVAUGHN, etc. Appellee.
No. 5D02-1134.
District Court of Appeal of Florida, Fifth District.
March 26, 2003.
*1129 Michael B. Swindle, Winter Park, for Appellant.
David C. Willis of Mateer & Harbert, P.A., Orlando, for Appellee.
THOMPSON, C.J.
Cheryl Ann DeVaughn Castille, the mother of Russell L. DeVaughn ("Rusty"), deceased, appeals an order appointing Michael L. DeVaughn, Rusty's uncle, personal representative of Rusty's estate. We agree that the trial court abused its discretion in making the appointment and reverse the order.

*1130 ISSUE
At issue in this case is whether the trial court abused its discretion when it appointed the uncle personal representative, thus giving him control of an expected wrongful death action arising out of Rusty's death. Rusty, a nineteen-year-old, was sitting on a lawn chair when he was fatally hit by a vehicle involved in a highspeed police chase in Seminole County. The uncle raised Rusty from the time Rusty was a young child, and the mother had no involvement with Rusty since he was four years old. The mother is preferred for appointment as personal representative under section 733.301(1)(b), Florida Statutes.

FACTS
Rusty was born in 1981. In 1983, after a police raid on their home, the mother and father, Mark DeVaughn, who were not at home when the raid occurred, signed a document purporting to make the uncle guardian of Rusty and his brother.[1] Apparently, physical custody was transferred to the uncle at that time. A year or two later, apparently, the parents moved to Jacksonville, Florida, leaving Rusty with the uncle in Washington State. At some point, the uncle brought Rusty's brother from Washington to the parents in Jacksonville. He returned to Washington, where Rusty apparently remained. Some time thereafter, the uncle and Mary J. Hodge, the woman with whom he lived, moved with Rusty to Florida, stopping in Jacksonville where the parents lived, and then going on to Sanford, where they settled. In 1986 or 1987, the uncle picked up one of Rusty's sisters, who was born in February 1985, from a laundry in Jacksonville and brought her to Sanford. The uncle's understanding was that the mother could not handle the child. At some point, the father announced to the uncle that he was leaving Rusty's mother, and the father moved to Sanford. Rusty lived in the uncle's household, while his brother and sister lived with the father. Within a year, the father and Rusty's sister and brother moved to Ohio. In October 1986, the mother obtained an ex parte judgment of divorce in Jacksonville. The judgment gave custody to the father and stated that the mother did not know the whereabouts of the father and children.[2] At the probate hearing below, the mother told the court that she had assumed the children were with the husband.
The uncle, a project manager for a construction company, had lived in Sanford since late 1985 or early 1986, and had been in and out of Sanford visiting relatives in previous years. He thought he should be personal representative because he raised Rusty and had, in his mind, been Rusty's "real" parent. He testified that he would never refer to Rusty as anything other than his son and explained that this was why he indicated on the death certificate that he was Rusty's father.[3]
The mother testified that she had last seen Rusty when he was four years old. *1131 She testified that she tried to locate her son in the intervening years, but was unable to do so. The mother testified that she learned of Rusty's death from the father, who she said, was a fugitive from justice. She did not attend Rusty's funeral. She testified that she could not reach the uncle because she did not have his telephone number, but was later able to reach county authorities. She learned of the administration of the estate from a notice sent by the uncle's attorney. Regarding her qualifications to be personal representative, the mother testified that following an investigation of her background, a Colorado social services agency approved the mother's gaining custody of her daughter, whom the agency had removed from the father's Colorado home. The mother's testimony was corroborated by documents issued by the Colorado agency.[4] In addition to the Colorado investigation, her background had been investigated in Washington in connection with her work with the elderly. She testified that she is an American citizen and has never been convicted of a crime.
The record shows that the law firm representing the uncle in the probate case sent the mother a letter which stated that an estate needed to be opened "to handle any assets resulting from possible insurance proceeds or other sources," and which told her that although she was statutorily preferred to be appointed personal representative, the uncle had agreed to serve because the parents lived so far away and because the uncle had raised Rusty. The letter requested that the mother sign an enclosed document consenting to the appointment of the uncle. Although the mother did not consent, the uncle filed a petition for administration which said that both parents had consented to the uncle's appointment.[5] A verified consent from the father was attached to the petition. Also attached was the death certificate, which stated that the uncle and Mary J. Hodge were Rusty's parents. The petition named the parents as beneficiaries of the estate, along with the uncle and Mary J. Hodge, who were listed as beneficiaries by virtue of their being "de facto" parents.
The mother filed an objection to the uncle's petition and filed her own petition for administration, seeking appointment as the personal representative. After a hearing, the court entered the order appointing the uncle personal representative. The court found that Rusty's estate would have few assets other than the potential recovery in the anticipated wrongful death action. It found that Rusty had no children and that the parents were the survivors under the Wrongful Death Statute. The court found the mother's testimony that she tried to locate her children on numerous occasions lacking in credibility. The court ruled that the mother was statutorily preferred to be appointed personal representative, and that the uncle did not have a cause of action for the wrongful death. Nevertheless, the court appointed the uncle personal representative stating: "although [the uncle] will not be entitled to share in any proceeds of the wrongful death suit to be filed, he has a personal *1132 and emotional stake in seeing that the potential defendants pay appropriate damages for the death of [Rusty], although those damages will only inure to the benefit of the survivors of [Rusty], to wit, [the mother] and [the father]." The court found that the mother "does not have [ ] as intense [a] personal and emotional stake in the outcome of the suit."

STANDARD OF REVIEW
The appointment of a personal representative for an intestate estate is a discretionary act of the probate courts. In re Estate of Snyder, 333 So.2d 519, 520 (Fla. 2d DCA 1976). Whether the court abused its discretion is determined in accordance with Canakaris v. Canakaris, 382 So.2d 1197 (Fla.1980).

DISCUSSION
We first consider the duties of the personal representative. The personal representative acts in a fiduciary capacity and has obligations to the creditors, the interested taxing authorities, and, most important in this case, the heirs. See Estate of Snyder, 333 So.2d at 521. The personal representative is merely a nominal party to the wrongful death action. Florida Emergency Physicians-Kang & Associates, M.D., P.A. v. Parker, 800 So.2d 631, 633 (Fla. 5th DCA 2001). The estate and the survivors are the real parties in interest. Id.; § 768.20, Fla. Stat. Wrongful death actions are brought on behalf of the survivors, not to recover for injuries to the deceased, but to recover for statutorily identified losses the survivors have suffered directly as a result of the death. City of Pompano Beach v. T.H.E. Insurance Co., 709 So.2d 603, 605 (Fla. 4th DCA 1998) (citing Martin v. United Sec. Services, Inc., 314 So.2d 765, 769 (Fla.1975)). In this case, the personal representative would have a fiduciary duty to the mother and father.
We next consider the mother's prerogative to be appointed personal representative. When a deceased dies intestate, the order of preference for appointment is:
1. The surviving spouse.
2. The person selected by a majority in interest of the heirs.
3. The heir nearest in degree. If more than one applies, the court may select the one most qualified.
§ 733.301(1)(b), Fla. Stat. In this case, the parents are the heirs nearest in degree to Rusty. As to the father, the trial court found that there was an outstanding warrant for his arrest, and the father has not made an appearance in this case, leaving the mother as the person preferred to be personal representative. The uncle does not dispute that the mother's preference under the statute is higher than his. The mother testified that she had never been convicted of a crime, was a citizen of the United States, and was gainfully employed. Further, she testified that she would soon regain custody of her daughter and had been investigated and approved by state officials in Washington to work with the elderly. The uncle presented no evidence to show that she was not qualified to be the personal representative, nor did the trial court determine that she could not serve as personal representative.
On the other hand, the uncle raised Rusty and considered him to be his son. This may explain why he hired an attorney to recover money damages on his behalf.[6] *1133 At the hearing below, the uncle would not state categorically whether he intended to file a wrongful death suit on his own behalf (as a "de facto" parent), but he moved for rehearing of the trial court's ruling that he was not a survivor under the Wrongful Death Act. He ultimately withdrew the motion for rehearing, and on appeal does not dispute the trial court's ruling that he is not a survivor under the Wrongful Death Act. Section 768.18, Florida Statutes, provides that "survivors" are "the decedent's spouse, minor children, parents, and, when partly or wholly dependent on the decedent for support or services, any blood relatives and adoptive brothers and sisters."
We recognize that a party having preference and who is not disqualified by the statute does not have an absolute right to the appointment. See Estate of Snyder, 333 So.2d at 520. Further, we know that the probate court has the inherent authority to consider a person's character, ability, and experience to serve as personal representative. See Padgett v. Estate of Gilbert, 676 So.2d 440, 443 (Fla. 1st DCA 1996). However, if the statutorily preferred person is not appointed, the record must show that the person is not fit to be appointed. If the record supports the conclusion that the statutorily preferred person "lacks the necessary qualities and characteristics," the court has discretion to refuse to make the appointment. Id. For example, a person may be unsuitable to serve as personal representative because of an interest adverse to the estate or hostility to those interested in the estate. Estate of Snyder, 333 So.2d at 520. That there are ill feelings, disputes, and strained relationships among the heirs does not necessarily prohibit one of them from being the best qualified. In re Estate of Harper, 271 So.2d 40, 42 (Fla. 1st DCA 1973). Cf. In re Estate of Schleider, 770 So.2d 1252, 1254 (Fla. 4th DCA 2000) (holding that "if a dispute which will result in unnecessary litigation and impede the administration of the estate is combined with other factors ... the totality of the circumstances may rise to a level that allows the trial court to exercise its discretion in refusing to appoint the personal representative named in the will.")
In this case, although the mother's family is fragmented, the record does not support the conclusion that she lacks the character, ability, and experience required to prosecute the wrongful death case or to administer the estate. There is no showing that the mother has an interest adverse to the estate or a disqualifying hostility to the father, the only other person interested in the estate, or that appointing her would result in unnecessary litigation and impede the administration of the estate. Indeed, the court did not find that the mother lacked the necessary qualities and characteristics or was otherwise unsuited to be personal representative. Rather, the court found that the uncle had a greater personal stake in exacting redress for the death of Rusty, which is to say that the uncle is the more bereaved. In our opinion, the fact that a person with no interest in the estate is more bereaved than the statutorily preferred person does not make the latter unsuited to be personal representative, and it certainly does not entitle the former to be personal representative instead of the statutorily preferred person.
A trial court has discretion to appoint someone other than the preferred person, but where there is no evidence that the preferred person is not fit to be personal representative the court is not at liberty to ignore the statutory directive in order to appoint a person whom the court deems more morally worthy. Although the right to be appointed administrator *1134 may not necessarily be measured by the same standard used in determining the right to inherit, Estate of Snyder, 333 So.2d at 520, the statute favors heirs for appointment as personal representative because those who are eligible to take under the laws of intestacy are more likely to advance the interest of the other takers. In this case, it is the mother rather than the uncle who is more likely to advance the interests of the heirs.

CONCLUSION
The discretionary power that is exercised by a trial judge is not without limitation. In Canakaris, the court wrote:
The trial court's discretionary power is subject only to the test of reasonableness, but that test requires a determination of whether there is logic and justification for the result. The trial courts' discretionary power was never intended to be exercised in accordance with whim or caprice of the judge nor in an inconsistent manner. Judges dealing with cases essentially alike should reach the same result. Different results reached from substantially the same facts comport with neither logic or reasonableness.
382 So.2d at 1203.
Even in view of the trial court's intention to recognize the uncle's emotional investment in Rusty's life, we cannot find the appointment to be reasonable. In Kremer v. Kremer, 595 So.2d 214 (Fla. 2d DCA 1992), the court stated:
Judicial discretion has never been confused with the raw power to choose between alternatives, such as to go or not to go. Nor is judicial discretion unreviewable simply because the trial judge chose an alternative that was theoretically available to him. As he did with so many complex ideas, Justice Cardozo distilled the essence of the thought in a few words:
The judge, even when he is free, is still not wholly free. He is not to innovate at pleasure. He is not a knight-errant, roaming at will in pursuit of his own ideal of beauty or of goodness. He is to draw his inspiration from consecrated principles. He is not to yield to spasmodic sentiment, to vague and unregulated benevolence. He is to exercise a discretion informed by tradition, methodized by analogy, disciplined by system, and subordinated to "the primordial necessity of order in the social life." Wide enough in all conscience is the field of discretion that remains.
Id. at 217-218 (quoting B. Cardozo, The Nature of the Judicial Process, at 141). Here, the trial court's discretion was bound by Canakaris and further circumscribed by section 733.301, which prefers the mother for appointment. In the absence of a reason not to appoint the mother personal representative, the trial court should have followed the statutory scheme.
In short, we hold that the trial court abused its discretion because there was no legal reason to interpose the uncle between the preferred party, the mother, and the subject matter of her interest. We reverse so that the trial judge can appoint the mother personal representative of Russell L. DeVaughn's estate.
REVERSED with directions.
SHARP, W., and ORFINGER, JJ., concur.
NOTES
[1] According to the mother's petition, Rusty had two brothers, Shad Anthony Caldwell and Timothy Lewis DeVaughn, and two sisters, Nicole Louise DeVaughn and Jessica DeVaughn.
[2] In the Final Judgment of Dissolution of Marriage, Judge Beverley wrote:

The husband shall have the primary residential care and custody of the children, Timothy Louis DeVaughn, Russell Lee DeVaughn, and Nichole Louise DeVaughn, and shall be responsible for their day-to-day care and supervision. Their present location is unknown to the Wife.
[3] Michael L. DeVaughn was the informant for the death certificate. He stated that he was Rusty's father and that Mary J. Hodge was Rusty's mother.
[4] The El Paso County Department of Human Service records introduced at the hearing stated that the child was removed from the father's custody because he had neglected her. Thereafter, she told the authorities that he had repeatedly sexually abused her. The records also stated that the father's whereabouts were unknown.
[5] At oral argument, Mr. Willis, the uncle's attorney, stated that it was an error to file the petition without a consent from the mother. He stated the error occurred in his firm's office and should not be attributed to the uncle.
[6] The record shows that the uncle hired Attorney Kenneth J. McKenna to file a lawsuit. Attorney McKenna contacted Mr. James B. Bogner to assist in probating the estate. Mr. Bogner asked Mr. Willis, a shareholder in the firm, to assume full responsibility for the appeal of this case.