[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-13765

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 29, 2010
JOHN LEY
CLERK

D.C. Docket  No. 07-01690-CV-ORL-31GJK

CARVONDELLA BRADLEY,
JOYCE ELAINE NIEVES,
LARHONDA WILLIAMS,
CHRIS CROWLEY,
DERRICK BURKE,
CHARLES E. BURKE, JR.,
GREG BURKE,
CYNTHIA BURKE,
BEATRICE WELLS,
KARL CROWLEY,
individually,

Plaintiffs-Appellants,

versus

KATHLEEN SEBELIUS,
Secretary, U.S. Department
of Health and Human Services,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(September 29, 2010)

Before DUBINA, Chief Judge, MARTIN and HILL, Circuit Judges.

HILL, Circuit Judge:

The facts of this claim against a Florida nursing home for neglect and abuse are simple and not in dispute. However, the question of law as to the interplay between the Florida Wrongful Death Act (FWDA) and the federal Medicare Secondary Payer statute (MSP) is an issue of first impression in this court.

I.

Charles Burke (Burke or Decedent) resided in a Gainesville nursing home for approximately eighteen (18) months. In November 2004, Burke was removed from the nursing home and admitted to a Gainesville medical hospital. On January 30, 2005, he died in the hospital as a result of multi-organ failure, secondary to sepsis and wound infection. During Burke's approximate three (3) month hospital stay, the Secretary of the Department of Health and Human Services (Secretary or HHS), on behalf of Medicare, paid $38,875.08 for Burke's medical care.[1]

One of Burke's surviving children, Carvondella Bradley (Bradley), was named as personal representative of Burke's estate. Bradley, on behalf of the estate and the ten surviving Burke children, presented a wrongful death claim in a

---

[1] Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq*., commonly known as the Medicare Act, established the Medicare program. For convenience, we refer to the United States as the Secretary, HHS, Medicare or the government, as the context requires.

demand letter to Burke's nursing home and its liability insurance carrier, asserting

nursing home abuse and neglect under Florida law.[2]

Bradley settled the wrongful death tort claims for $52,500, the full amount

of the nursing home's liability insurance policy limits.[3] Settlement was made

without filing suit. Burke's nursing home tendered the settlement amount and

Bradley executed a release of all claims of the estate and the surviving children

against the nursing home and its liability insurance carrier.[4]

Bradley notified the Secretary of the settlement proceeds and associated

legal fees and costs. The Secretary refused to recognize that the medical expense

---

[2] Florida's Wrongful Death Act (FWDA) is codified at Fla. Stat. §§ 768.16 to 768.26 (2003). Under Florida law, "[t]he action shall be brought by the decedent's personal representative, who shall recover for the benefit of the decedent's survivors and estate all damages, as specified in this act, caused by the injury resulting in death." Fla. Stat. § 768.20. Children of a decedent may also recover for lost parental companionship, instruction, and guidance and for mental pain and suffering from the date of injury. Fla. Stat. § 768.21(3).

[3] The personal representative of an estate is merely a nominal party to a wrongful death action brought on behalf of a decedent; the estate and the decedent's survivors are the real parties in interest. *See DeVaughn v. DeVaughn*, 840 So.2d 1128 (Fla. Dist. Ct. App. 2003); *Fla. Emergency Physicians-Kang and Assocs., M.D., P.A. v. Parker*, 800 So.2d 631 (Fla. Dist. Ct. App. 2001).

[4] At the time, no allocation was made in regard to the $52,500 settlement lump sum as to the wrongful death claims of the ten surviving children, and the claim of the estate. In view of the limited insurance coverage, no evidence in the record of other nursing home assets, and the ever present hazards of trial, counsel for the estate and the children determined that the policy limit settlement was a practical and efficient alternative to filing suit. No party in this record has suggested that this settlement was not a reasonable disposition, though it obviously represented a considerably diminished compromise. There is speculation in the record that the potential value of the loss of companionship claims to the children was estimated to be over $2,500,000, or $250,000 per child.

claim had been settled for less than 100%. She asserted that under the MSP, 42 U.S.C. §1395y(b)(2)(B)(ii), and its attendant regulations, 42 C.F.R. § 411.37(c), the Secretary had the authority to claim the total amount of medical expenses, $38,875.08, less procurement costs, or a net amount of $22,480.89. The Secretary gave the estate sixty (60) days to pay Medicare.[5]

Counsel for the children and the estate filed with the probate court an application for the court to adjudicate the rights of the estate and the rights of the children in regard to the compromised sum received in settlement of their claims.[6] *See Thompson v. Hodson*, 825 So.2d 941, 950 (Fla. Dist. Ct. App. 2002) (where the personal representative receives a nonspecific settlement offer in a wrongful death action, he or she is obligated to apportion the proceeds between the estate and the survivors in a reasonable and equitable manner or to seek court approval of an apportionment); *Hess v. Hess*, 758 So.2d 1203 (Fla. Dist. Ct. App. 2000).

---

[5] The Secretary's position is that the children are forced to "chip in" a substantial portion of their recovery to make Medicare's recovery 100%. She does not acknowledge that this would constitute a taking of their property with no process.

Medicare had not paid for or provided medical care for any of the children. None of the children contributed funds to pay for their father's medical care and none were under any obligation to do so. *See Scott v. Estate of Myers*, 871 So.2d 947, 949 (Fla. Dist. Ct. App. 2004) (where proceeds from a wrongful death action are not for the benefit of the estate, and are not subject to estate claims; rather, they are the property of the survivors and compensation for their loss).

[6] The Florida Legislature designated the probate court as the appropriate entity in which to adjudicate the rights of the parties. Fla. Const. of 1845, art. V, § 5.

Counsel for the children and the estate gave adequate notice to Medicare of the probate court proceedings and invited the Secretary's participation. The Secretary declined to appear or to participate.[7]

The state probate court ordered:

(c) . . . The Court after having heard sworn testimony on the potential value of each child/survivors' independent claim, and after calling on its own experience in the range of values each child's claim potentially carried, finds that the values asserted by the Personal Representative's counsel in this motion are reasonable, and the Court adopts and specifically finds that each of the respective ten (10) survivors' claims holds a value of at least $250,000.00. The Court notes that Medicare has asserted a claim of lien based upon payments of $38,875.08. Therefore, the Court finds that the total, full value of this case had the total, full value been collectible, was/is $2,538,875.08.

(d) *Based upon principles of equity, the Court determines the medical expense recovery in the instant cause is $787.50.* The Court has calculated such figure based on such component's contribution to the total full value, if such value were collectible. The Court has not prioritized the recovery of medical expenses over the recovery on each of the respective survivors' claims. *Further, the Court determines the independent survivors' claims recovery in the instant cause is $51,712.50. The Court has likewise calculated such figure based on all survivors' claims contributions to the total, full value. The Court has likewise not prioritized the recovery on each of the*

---

[7] Under the FWDA, the decedent's personal representative can recover for the decedent's estate only "*medical* or funeral expenses *due to the decedent's injury or death that have become a charge against her or his estate or that were paid by or on behalf of the decedent*." Fla. Stat. § 768.21(6)(b). (Emphasis added). A survivor, on the other hand, may recover only "[m]edical or funeral expenses due to the decedent's injury or death *that the survivor has paid*." Fla. Stat. § 768.21(5). (Emphasis added). There had been no wrongful death suit filed. The claim had been settled. There was an undifferentiated fund – $52,500 paid for the release – in Bradley's possession for the benefit of the surviving children and any other claimant.

5

*respective survivors' claims over the recovery of medical expenses.*

(Emphasis added).

The Secretary refused to accept the probate court's determination that she would only recover $787.50. Relying upon language contained in a document entitled 'Medicare Secondary Payer Manual', the Secretary responded that she would not recognize the probate court's allocation of liability payments to non-medical losses unless and until payment was based on a court order issued on the merits of the controversy. *See* MSP Manual (CMS Pub. 100-05) Chapter 7, § 50.4.4 (where "[t]he only situation in which Medicare recognizes allocations of liability payments to non-medical losses is when payment is based on a court order on the merits of the case").[8]

---

[8] Chapter 7, Section 50.4.4 of the MSP Manual states:

In general, Medicare policy requires recovering payments from liability awards or settlements, whether the settlement arises from a personal injury action or a survivor action, without regard to how the settlement agreement stipulates disbursement should be made. That includes situations in which the settlements do not expressly include damages for medical expenses. Since liability payments are usually based on the injured or deceased person's medical expenses, liability payments are considered to have been made "with respect to" medical services related to the injury even when the settlement does not expressly include an amount for medical expenses. To the extent that Medicare has paid for such services, the law obligates Medicare to seek recovery of its payments. *The only situation in which Medicare recognizes allocations of liability payments to non-medical losses is when payment is based on a court order on the merits of the case.* If the court or other adjudicator of the merits specifically designates amounts that are for payment of pain and suffering or other amounts not related to medical services, Medicare will accept the Court's designation. Medicare does not seek

The Secretary contended that the probate court's decision was merely advisory in nature or superceded by federal law. The estate paid Medicare under protest, perfected its administrative appeal, and exhausted its administrative remedies.[9]

## II.

The case proceeded as an appeal to the district court from a final decision of the Secretary, wherein the surviving children filed their brief in opposition to the Secretary's decision, the Secretary filed her brief in support of her final decision, and the case became ripe for district court review.

The district court, adopting the report and recommendation of the magistrate judge, held that the Secretary's interpretation of the MSP, 42 U.S.C. §

---

recovery from portions of court awards that are designated as payment for losses
other than medical services.

(Emphasis added).

[9] Originally, in 2007, the ten surviving children, as surviving individuals, not as heirs to an estate, filed a complaint for a declaratory judgment in federal district court, asking the court to adjudicate and determine the rights and priorities of the respective parties' interests, including the Secretary's, in the wrongful death settlement funds procured under the FWDA. The estate was not a party to the declaratory judgment action.

The survivors sought a declaration that the Secretary, under federal law, had no priority over the survivors' rights in the settlement proceeds under state law. The survivors also claimed that the Secretary could not hide behind the advisory language of a Medicare field manual that indicated it would honor an agreed allocation, if and only if the agreement was reflective of an actual trial and judgment on the merits, when the Secretary refused to attend the probate hearing. In 2008, the district court dismissed the declaratory judgment complaint filed by the survivors on 28 U.S.C. § 1331 grounds.

1395y(b)(2)(B)(ii)(2006), and its attending regulations, 42 C.F.R. §§ 411.37(c)(1), (c)(2), (c)(3)(2004), was reasonable. The district court also relied heavily upon the language contained in the Medicare field manual. Accordingly, the district court held that Medicare was entitled to reimbursement in the amount of $22,480.89, not $787.50, for conditional medical expense payments paid on behalf of the Decedent. This appeal follows.

## III.

We review *de novo* the district court's interpretation of the MSP federal statute in relation to the FWDA as a question of law over which this court's review is plenary. *See United States v. Endotec, Inc.*, 563 F.3d 1187, 1194 (11th Cir. 2009). In reviewing the district court's analysis of the Secretary's decision, we may reverse the district court if its decision is "arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence in the record taken as a whole." *Univ. Health Servs., Inc. v. Health & Human Servs.*, 120 F.3d 1145, 1148 (11th Cir. 1997) (citations omitted).

## IV.

The Burke surviving children contend that the FWDA controls. As previously stated, under Florida law, in a recovery for wrongful death action, children of the decedent may recover for lost parental companionship, instruction,

and guidance and for mental pain and suffering from the date of injury. Fla. Stat. § 768.21(3). The FWDA contemplates that damages allowed an estate are separate and distinct from damages recoverable by the deceased's survivors. *See Hartford Ins. Co. v. Goff*, 4 So.3d 770, 773 (Fla. Dist. Ct. App. 2009); *South Shore Hosp. v. Easton*, 441 So.2d 161, 163 (Fla. Dist. Ct. App. 1983). Florida courts have repeatedly held that proceeds from a wrongful death action are not for the benefit of the estate, rather, that they are the property of the survivors and compensation for their loss. *See Scott v. Estate of Myers*, 871 So.2d 947, 949 (Fla. Dist. Ct. App. 2004); *Continental Nat. Bank v. Brill*, 636 So.2d 782, 784 (Fla. Dist. Ct. App. 1994). Here the children's right of action under the FWDA is an individual's property right, not derived from the estate.[10]

## V.

The Secretary relies upon the MSP, enacted in 1980 to reduce federal health care costs by transforming Medicare from the primary payer to the secondary payer, with a right of reimbursement. *See United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 874 (11th Cir. 2003). The MSP "makes Medicare the secondary payer

---

[10] Under Fla. Stat. § 768.21(6)(b), the personal representative may recover for the decedent's estate medical expenses due to the decedent's injury or death that have become a charge against his estate or that were paid by or on behalf of decedent.

for medical services provided to Medicare beneficiaries whenever payment is

available from another primary payer." *Cochran v. U.S. Health Care Financing

Admin.*, 291 F.3d 775, 777 (11th Cir. 2002). "This means that if payment for

covered services has been or is reasonably expected to be made by someone else,

Medicare does not have to pay . . . ." *Id.*; *see* 42 U.S.C. § 1395y(b)(2)(A)(i)

(2006).[11]

---

[11] The portions of the MSP statute relevant here are contained at 42 U.S.C. §
1395y(b)(2)(A)-(B)(iv) (2006), and read as follows:

> (2) Medicare secondary payer
>> (A) In general
>>> Payment under this subchapter may not be made, except as
>>> provided in subparagraph (B), with respect to any item or service
>>> to the extent that –
>>>> (i) payment has been made, or can reasonably be
>>>> expected to be made, with respect to the item or
>>>> service as required under paragraph (1), or
>>>> (ii) payment has been made or can reasonably be
>>>> expected to be made promptly (as determined in
>>>> accordance with regulations) under a workmen's
>>>> compensation law or plan of the United States or a
>>>> State or under an automobile or liability insurance
>>>> policy or plan (including a self-insured plan) or
>>>> under no fault insurance.
>>>
>>> In this subsection, the term "primary plan" means a group health
>>> plan or large group health plan, to the extent that clause (i) applies,
>>> and a workmen's compensation law or plan, an automobile or
>>> liability insurance policy or plan (including a self-insured plan) or
>>> no fault insurance, to the extent that clause (ii) applies. An entity
>>> that engages in a business, trade, or profession shall be deemed to
>>> have a self-insured plan if it carries its own risk (whether by a
>>> failure to obtain insurance, or otherwise) in whole or in part.
>
>> (B) Conditional payment

10

(i) Authority to make conditional payment

The Secretary may make payment under this subchapter with respect to an item or service if a primary plan described in subparagraph (A)(ii) has not made or cannot reasonably be expected to make payment with respect to such item or service promptly (as determined in accordance with regulations). Any such payment by the Secretary shall be conditioned on reimbursement to the appropriate Trust fund in accordance with the succeeding provisions of this subsection.

(ii) Repayment required

A primary plan, and an entity that receives payment from a primary plan, shall reimburse the appropriate Trust Fund for any payment under this subchapter with respect to an item or service if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service. A primary plan's responsibility for such payment may be demonstrated by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or service included in a claim against the primary plan or the primary plan's insured, or by other means. If reimbursement is not made to the appropriate Trust Fund before the expiration of the 60-day period that begins on the date notice of, or information related to, a primary plan's responsibility for such payment or other information is received, the Secretary may charge interest (beginning with the date on which the notice or other information is received) on the amount of the reimbursement until reimbursement is made (at a rate determined by the Secretary in accordance with regulations of the Secretary of the Treasury applicable to charges for late payments).

(iii) Action by United States

In order to recover payment made under this subchapter for an item or service, the United States may bring an action against any or all entities that are or were required or responsible (directly, as an insurer or self-insurer, as a third-party administrator, as an employer that sponsors or contributes to a group health plan, or large group health plan, or large group health plan, or otherwise) to make payment with respect to the same item or service or any portion thereof) under a primary plan. The United States may, in accordance with paragraph (3)(A) collect double damages against any such entity. In addition, the United States may recover under this clause from any entity that has received payment from a primary plan or from the proceeds of a primary plan's payment to

11

Such payment is conditioned on Medicare's right to reimbursement if a primary plan later pays or is found to be responsible for payment of the item or service. *Id*. Nowhere in the definition of primary plan are listed "surviving children with tort property beneficiary rights."[12] *Id*.

## VI.

In this case, Bradley, as personal representative, on behalf of the estate and the ten surviving Burke children, settled wrongful death claims for abuse and neglect brought under the FWDA with the nursing home and its liability insurance carrier. The total, undifferentiated amount of the settlement was $52,500.00. The issue of first impression in this case is therefore: "Whose property is the settlement?" The settlement involved the medical expenses and costs recovered

_____

any entity. The United States may not recover from a third-party administrator under this clause in cases where the third-party administrator would not be able to recover the amount at issue from the employer or group health plan at the time the action for recover is initiated by the United States or for whom it provides administrative services due to the insolvency or bankruptcy of the employer or plan.
(iv) Subrogation rights
The United States shall be subrogated (to the extent of payment made under this subchapter for such an item or service) to any right under this subsection of an individual or other entity to payment with respect to such item or service under a primary plan.

[12] "In this subsection, the term 'primary plan' means a group health plan or large group health plan . . . and a workmen's compensation law or plan, an automobile or liability insurance policy or plan (including a self-insured plan) or no fault insurance . . . ." 42 U.S.C. § 1395y(b)(2)(A) (2006). *See also supra* note 11.

by the estate (and subject to the MSP statute), *along with* the non-medical, tort property claims of the surviving Burke children for lost parental companionship, etc., under state law, (*and not subject to the MSP statute*).[13]

Under Florida law, any claim of the estate is separate and distinct from the claim of a survivor. All loss of consortium or companionship recoveries are the property of the person who incurred the loss. Not the Secretary of HHS. A child's loss of parental companionship claim is a property right belonging to the child. Not the Secretary of HHS. The Burke children's loss of parental companionship claims do not include the decedent's medical expenses, as a claim for medical expenses belongs only to the estate. Only the estate's allocated share of the proceeds is subject to the province of the Secretary.[14]

## VII.

There is a particularly troubling sub-issue contained in this appeal. Here counsel for the estate and for the survivors, out of an abundance of caution,

---

[13] The Burke surviving children recovered damages for lost parental companionship, instruction, and guidance and for mental pain and suffering. The estate's wrongful death claim included medical expenses and costs. The children's claims did not. The children never received anything from Medicare. They paid none of their father's medical expenses, nor were they obligated to pay any.

[14] This appeal involves the ten surviving Burke children, not as heirs or beneficiaries of their deceased father's estate, but as survivors entitled to compensation under the FWDA. Theirs is a cause of action under state law, sounding in tort against the nursing home and its insurance carrier for the loss of their father.

13

notified the Secretary of the $52,500 in settlement proceeds recovered, and invited

her view as to the proper division of the funds in an adversarial probate court

proceeding. The Secretary asserted that she was entitled to the total amount of

medical expenses, $38,500, less procurement costs.[15]

At this point, the conflicting claims to the fund had never been made the

subject of any court proceeding.[16] Counsel properly turned to the Florida probate

court for a proration, filing an application with the probate court to adjudicate the

rights of the estate and rights of the children *vis-à-vis* the rights of the Secretary to

the compromised sum received in settlement of the claims.[17]

The Secretary declined to take any part in the litigation although at all times

her position was adverse to the interests of the surviving children. The probate

court made the allocation, finding that the Secretary should recover the sum of

$787.50. Yet, still, the Secretary, citing no statutory authority, no regulatory

authority, and no case law authority, merely relied upon the language contained in

---

[15] It is obvious that under such an arrangement, the reasonable expectations of the children would be remarkably reduced. The Secretary would get 100% of her funds, and the estate and the surviving children would be left with the insufficient remainder.

[16] Counsel for the estate and the surviving children refused to agree that their claims should be treated as inferior to the claims of the Secretary or that any of the property of the children should be taken from them to "beef up" the share of Medicare.

[17] Counsel did this openly and in good conscience. He notified the Secretary of the pendency of the proceedings and invited the Secretary to participate.

one of its many field manuals and declined to respect the decision of the probate court.

In essence, the Secretary is asserting that its field manual is entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). The Supreme Court has stated that "agency interpretations contained in policy statements, manuals, and enforcement guidelines are not entitled to the force of law." *United States v. R & F Properties of Lake County, Inc.*, 433 F.3d 1349, 1357 (11th Cir.2005) *citing Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (ordinarily "policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law – do not warrant *Chevron*-style deference"); *see Shalala v. Guernsey Memorial Hosp.*, 514 U.S. 87, 99 (1995) (definition in HHS's Medicare Provider Reimbursement Manual "is a prototypical example of an interpretive rule" that does not require notice and comment, and therefore "do[es] not have the force and effect of law and [is] not accorded that weight in the adjudicatory process").[18] We conclude that the deference given to the language in the field manual in this case by the Secretary

---

[18] Medicare field manuals are not promulgated pursuant to the Administrative Procedures Act, 5 U.S.C. § 551, *et seq.*, as agency rules. Accordingly they are entitled to less deference than an interpretation arrived at after a formal adjudication or notice-and-comment rulemaking. *See, e.g., Guernsey Memorial Hosp.*, 514 U.S. at 99; *South Shore Hosp., Inc. v. Thompson*, 308 F.3d 91, 103 (1st Cir. 2002) (a Medicare field manual "is merely an interpretive guide, and interpretive guides generally do not have the force of law.").

and the district court is misplaced.

Counsel for the survivors and the estate acted sensibly, in a cost-effective manner. The nursing home neglect claim was settled for the full value of the available insurance. Clearly, if the language of the field manual applied, in practice, it would lead to an absurd Catch-22 result.[19] Forcing counsel to file a lawsuit would incur additional costs, further diminishing the already paltry sum available for settlement. This flies in the face of judicial and public policy.

The Secretary's position is unsupported by the statutory language of the MSP and its attending regulations. The Secretary's *ipse dixit* contained in the field manual does not control the law. The district court also erred in relying upon the advisory language contained in a field manual as the rationale for its opinion upholding the actions of the Secretary.

## VIII.

There is a second reason that the Secretary's position, as adopted by the district court, is in error. Historically, there is a strong public interest in the expeditious resolution of lawsuits through settlement. *See, e.g., Hines v. Anchor*

---

[19] The Secretary declined to participate in the probate court's allocation proceeding but won't recognize the probate court's order as valid because she didn't participate. This paradox has been compared to the oft-told story of the child defendant found guilty of murdering his parents, only to throw himself upon the mercy of the court because he is an orphan.

*Motor Freight, Inc.*, 424 U.S. 554, 574 (1976); *McDermott, Inc. v. AmClyde*, 511

U.S. 202, 215 (1994). Throughout history, our law has encouraged settlements.

*See United States v. Allegheny-Ludlum Industries, Inc.*, 517 F.2d 826 (11th Cir.

1975); *Fla. Trailer & Equip. Co. v. Deal*, 284 F.2d 567 (5th Cir. 1960); *Delancy v.*

*St. Paul Fire & Marine Ins. Co.*, 947 F.2d 1536 (11th Cir. 1991); *Johnson v.*

*Occidental Fire and Cas. Co. of North Carolina*. 954 F.2d 1581 (11th Cir. 1992).[20]

The Secretary's position would have a chilling effect on settlement. The

Secretary's position compels plaintiffs to force their tort claims to trial, burdening

the court system. It is a financial disincentive to accept otherwise reasonable

settlement offers. It would allow tortfeasors to escape responsibility.[21]

---

[20] Due to the inherent risk of litigation, the increased cost of taking a case to trial, problems of proof, a potential finding of contributory or comparative negligence, and limitations on the defendant's ability to pay full compensation, the vast majority of tort lawsuits are resolved by settlement. Settlement is often for less than the full value of the damages suffered by the plaintiffs. *See* Mark Galanter, *The Hundred-Year Decline of Trials and the Thirty Years War*, 57 Stan. L. Rev. 1255, 1272-74 (2005).

[21] Section 1395 is not a model of clarity. Yet it does clearly provide that, where there is some entity, other than Medicare, obligated to pay for an item or service, that entity shall pay first and Medicare shall pay the excess. *See* 42 U.S.C. § 1395y(b)(2)(A), (b)(2)(B)(ii). Here the liability insurance carrier of the nursing home became obligated to pay a compromise amount for services to Burke; the obligation was created as its consideration for the release by his estate. But no provision was made in the settlement to determine the amount of the compromise settlement fund paid to the estate and the amount paid to obtain the release of the separate claims of the children. [At this juncture, the liability insurance carrier was a "primary plan" under 42 U.S.C. § 1395y(b)(2)(A), and the estate was the "entity that receives payment from a primary plan" under 42 U.S.C. § 1395y(b)(2)(B)(ii).].

The Secretary clearly anticipated that a court should determine the issue of allocation between payees. She advised Medicare's field agents that Medicare would recognize allocations of such payments between payees if the allocation is based on a court order. The court involved

Without citing any statutory authority, regulatory authority, or case law authority, the Secretary and the district court's reliance upon language in a field manual is unpersuasive.[22]  The Secretary is not entitled to any share of the Burke surviving children's loss of parental companionship claims.[23]

## IX.

Under our *de novo* review, we conclude that the district court erred in upholding the decision of the Secretary because it was unsupported by substantial

here was the probate court of the state of Florida.  No other court was involved.  All parties were notified and invited to participate.

Lawyers routinely handling claims involving injury and medical expenses deal with settlements and judgments to resolve the participation in the settlement amounts by agreement or similar allocation litigation.  At present, there is no vehicle or mechanism in the MSP statute or its regulations that specifically prescribes how a lump sum settlement will be prorated between multiple parties.  Until better methods are prescribed and followed, the one pursued here is reasonable and, indeed, the only one available.

[22] Incidentally, we have not been advised by briefs or oral argument exactly how the parties could accomplish the Secretary's interpretation of the language in the field manual, even if we determined it was entitled to due deference, which we do not.  In a settled case or claim, there is no "court order on the merits of the case" if "the case" refers to the claims against the alleged tortfeasor.  Settlement replaces court proceedings.  However, here, there was an "allocation based on a court order."  The adverse parties interested in that proceeding were the estate and children on one hand, and the Secretary on the other.  The "merits of the case" were the merits of the Secretary's position versus the merits of those of the estate and children.  By this observation, however, we do not intend to indicate that compliance *vel non* with the field manual is a viable issue.

[23] Under both the statute and the regulations, the Secretary could have sought recovery from the liability carrier for the nursing home.  42 U.S.C. § 1395y(b)(2)(B)(ii). She could also have tried to obtain a recovery from the nursing home as tortfeasor.  *Id*.  The Secretary also has a right of subrogation which she chose not to exercise.  42 U.S.C. § 1395y(b)(2)(B)(iv).  However, what course the Secretary must take in the absence of a right of recovery against the Burke children for loss of companionship is a matter that this court need not decide, and we offer no opinion as to the Secretary's business.

18

evidence in the record taken as a whole. *See Univ. Health Servs., Inc.*, 120 F.3d at 1148. We reverse, finding the Secretary entitled to the sum of $787.50, as determined by the allocations of the probate court, and remand to the district court for further proceedings.

REVERSED AND REMANDED WITH INSTRUCTIONS.

MARTIN, Circuit Judge, dissenting:

I would affirm the decision of the District Court in this case, and therefore I write in dissent. Like the District Court, I recognize that when this court reviews the decisions of the Secretary of Health and Human Services, "we must abide by those decisions unless they are arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence in the record taken as a whole." Fla. Med. Ctr. of Clearwater, Inc. v. Sebelius, No. 09-13922, --- F.3d ----, 2010 WL 3258871, at *2 (11th Cir. Aug. 19, 2010) (quoting Alacare Home Health Servs., Inc. v. Sullivan, 891 F.2d 850, 854 (11th Cir. 1990) (alteration and internal quotation marks omitted)). Under this standard, I believe we are required to abide by the actions taken by Secretary Sebelius here.

As the majority notes, the facts of this case are straightforward: Mr. Burke developed severe bed sores while he was in the care of a nursing home facility. He was hospitalized, and eventually succumbed to multiple-organ failure secondary to sepsis and wound infection. Medicare conditionally paid $38,875.08 for his hospital treatment, subject to reimbursement from any payment made by the nursing home's liability insurance carrier. After the plaintiffs, through the personal representative of Mr. Burke's estate, received an undifferentiated settlement of $52,500 from the nursing home's insurer, Medicare requested that it

20

be reimbursed $22,480.89 for Mr. Burke's medical expenses. Rather than administratively appeal the agency's initial determination, however, the plaintiffs proceeded to the Probate Court of Alachua County, Florida, which simply adopted the plaintiffs' proposed allocation of a mere $787.50 to Medicare and the remaining $51,712.50 to themselves. The Secretary was never made a party to that proceeding. The Probate Court received no evidence nor any adversarial presentation.

Applying the express provisions of the agency's Medicare Secondary Payer manual, the Secretary declined to recognize the Probate Court's allocation because it was not based on a determination of the merits of the case. The Medicare Secondary Payer manual is a lengthy and comprehensive agency manual governing the complex workings of the Medicare Secondary Payer program and reflects the longstanding policy of the agency. While the majority opinion is correct when it says that such policy statements and guidance interpretations are not entitled to the force of law, it ignores what is required of us in the way of deference to agency interpretations of the complex statutory and regulatory schemes they administer. Statements and guidance interpretations such as the Medicare Secondary Payer manual "reflect 'a body of experience and informed judgment to which courts and litigants may properly resort for guidance,'" Fed.

21

Express Corp. v. Holowecki, 552 U.S. 389, 399, 128 S. Ct. 1147, 1156 (2008)

(quoting Bragdon v. Abbott, 524 U.S. 624, 642, 118 S. Ct. 2196, 2207 (1998)),

and they should not be lightly disregarded. In my view, the Secretary's

interpretation of the Medicare Secondary Payer statute and regulations embodied

in the manual is entitled to some deference.[24] Id.; see also, e.g., United States v.

Mead Corp., 533 U.S. 218, 234, 121 S. Ct. 2164, 2175 (2001) (explaining that

agency interpretations "may merit some deference . . . given the 'specialized

experience and broader investigations and information' available to the agency"

and "the value of uniformity in its administrative and judicial understandings of

what a national law requires" (quoting Skidmore v. Swift & Co., 323 U.S. 134,

139, 65 S. Ct. 161, 164 (1944))). Because I find the agency's guidance

sufficiently persuasive on the record before us, I would affirm the Secretary's

decision under the deferential standard of review applicable to our review of

agency decisions.

---

[24]In sharp contrast to the way the majority dismisses the Secretary's reliance on the
Manual here, this court has held that the Handbook developed by the Secretary of the Interior and
the Fish & Wildlife Service is in fact entitled to Chevron deference. Miccosukee Tribe of
Indians of Fla. v. United States, 566 F.3d 1257, 1273 (11th Cir. 2009).